Sandra AMES, et al., Plaintiffs–Appellants,

v.

AMERICAN NATIONAL CAN COMPANY, et al., Defendants–Appellees.

No. 97–4055.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1998.

Decided March 17, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied April 28, 1999.

752

Peter A. Steinmeyer, Lee T. Polk (argued), Ogletree, Deakins, Murphy, Smith & Polk, Chicago, IL, for Plaintiffs–Appellants.

william D. Heinz (argued), Jenner & Block, Chicago, IL, for Defendants–Appellees.

Before FLAUM, MANION, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

In 1995, American National Can Company ("ANC") decided to sell its Food Metal & Specialties Division ("Food Metal") to Silgan Containers Corporation ("Silgan"). This case concerns the benefits to which certain salaried employees of Food Metal believed they were entitled as a result of that event under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et*

*seq.* ANC saw things differently, and so the employees sued, alleging claims for severance pay, pension benefits, and damages for a violation of the ERISA ban on interfering with protected rights. They also alleged that ANC had violated the disclosure rules under ERISA and that the plan fiduciaries had breached their duty to the plaintiffs. The district court ruled in ANC's favor, finding that the plaintiffs had failed to exhaust their internal remedies under the plan, that there was no breach of fiduciary duty, and that, with one exception the court thought did not require a penalty, ANC had not breached its disclosure duties. We affirm.

# I

ANC is a plan sponsor of a number of employee benefit plans that fall within the ambit of ERISA. The plans at issue here are the ANC Pension Plan for Salaried Employees ("Pension Plan") and the ANC Severance Pay Plan ("Severance Plan"). The plaintiffs, who are proceeding together, but not as a certified class, are 169 former salaried employees of ANC who worked in the Food Metal Division. They were all participants in both the Pension Plan and the Severance Plan.

In early 1995, ANC made the business decision to sell Food Metal to Silgan. Personnel issues loomed large, as they frequently do, and ANC went to some lengths to work out how the Food Metal employees would make the shift over to Silgan. On March 29, 1995, the ANC Retirement Board, which acted as the plans' fiduciary, amended the Pension Plan to provide a sweetened early retirement option for certain employees of the corporate staff department. Later, on October 16, 1995, the Board amended the Severance Plan to provide additional payments for people eligible for the early retirement plan. None of the plaintiffs satisfied the eligibility criteria the Board had established for these special programs.

The plaintiffs instead fell within the group of employees that ANC was trying to preserve so that it could transfer Food Metal as a going concern to Silgan. On June 2, 1995, ANC entered a formal asset purchase agreement with Silgan. One of the terms commit-ted ANC to take all reasonable steps to ensure that the Food Metal employees would be available to Silgan; it promised, in effect, not to cherry-pick employees from Food Metal by allowing them to transfer to other divisions of ANC without Silgan's prior consent, and it promised not to lure the Food Metal employees into early retirement by offering sweeteners to them. The new "blocking" policy on intra-ANC transfers represented a change from past policies.

ANC publicized the impending benefits changes to the affected employees in a number of ways. It held a series of informational meetings during which the changes were explained orally to the employees. Paul Kron, ANC's Senior Executive Vice President and Chief Operating Officer, Food and Healthcare, also sent a letter to all salaried Food Metal employees on June 23, 1995, explaining the impact of the sale to Silgan on their benefits. Last, ANC sent individualized communications to each salaried employee, including all the plaintiffs, calculating individual pension estimates for each one and explaining the pension, severance, and other benefits they would receive after leaving ANC.

Before the sale, Dennis Bankowski, ANC's Vice President of Human Resources and Chairman of the Retirement Board, and Jack Schemm, Vice President of Employee Relations, traveled to Silgan's California headquarters for a meeting. One topic discussed at that meeting was the benefits package Silgan planned to offer the Food Metal employees who accepted Silgan employment. After reviewing the materials made available to them, Bankowski and Schemm concluded that the benefits to be offered by Silgan were roughly comparable to those provided by ANC. In his letter of June 23, 1995, Kron accordingly informed the recipients that "[t]he [ANC and Silgan] programs are not identical and individuals may be affected in different ways, but in the aggregate, the total value of the programs of the two companies is very comparable."

After the sale, Silgan offered continuing employment to virtually everyone in the plaintiff group. (Four were able to remain

on ANC's payroll and take early retirement, which they did.) The hourly employees (none of whom are in the plaintiff group) eventually negotiated an agreement with ANC under which not only was their ANC service recognized for purposes of their Silgan benefits, but they also secured certain pension enhancements under which some of their post-sale Silgan service was credited to their ANC pension accounts.

At the time of the sale, the Severance Plan provided employees a certain amount of severance pay if they were terminated without cause. Before the sale to Silgan was finalized, however, ANC informed the plaintiff group that they would not receive severance pay from ANC, with one exception. Silgan agreed that if it laid off any of the transferred employees within one year of the sale, it would pay that person the severance pay to which she would have been entitled under the ANC plan, rather than the lesser amount the Silgan plan would offer. (In the end, 15 employees took advantage of this option.) The ANC plan said that no severance pay would be given if

> the Employee transfers to a successor Company (or affiliate thereof) without an interruption in employment, or the Employee refuses a reasonable job offer with a successor Company (or any affiliate thereof) which does not require a relocation.

It was ANC's position that even though the employees were technically terminating their employment with ANC and being "rehired" by Silgan (which had reserved the right not to hire people it did not want), the transfer from ANC to Silgan qualified as a transfer to a successor company without an interruption in employment. Just to be extra sure, the Board retroactively amended the plan on October 16, 1995, to provide that "[a]n organization shall also be considered a 'Successor Company' of the Company if it is so designated by the Company as such for the purposes of this Plan."

The plaintiffs did not take advantage of the internal plan appeals processes for either of the benefits they believed had wrongfully been denied to them: the failure to give them the same bridging benefits that the executive office personnel were offered, and the failure to pay severance benefits upon the end of their ANC employment. They did seek information from ANC, through counsel, by means of a letter dated April 1996, but ANC was not as forthcoming as they believed it should have been. In August 1996, their lawyer sent a follow-up letter, requesting more documents and a meeting. ANC replied that it had provided all the documents it was required to furnish, and that it would agree to a meeting if plaintiffs' counsel provided a list of the issues to be discussed. No such list was ever provided, nor did plaintiffs get the documents they wanted until the discovery phase of this litigation.

## II

On appeal, the plaintiffs have limited themselves to three broad points: first, they claim that the district court erred when it held that the only way in which ANC violated the ERISA disclosure rules was by failing to provide the Severance Plan, and that it abused its discretion when it declined to award a monetary penalty for this omission; second, they argue that the court should not have granted summary judgment for the defendants on their breach of fiduciary duty claim; and third, they urge us to find that the district court abused its discretion in dismissing their claims for severance pay and interference with ERISA benefits because of the blocking policy, on the ground that they had failed to exhaust plan remedies. We take these arguments in reverse order.

### A. Severance and Interference Claims

Counts IV and VI of the plaintiffs' complaint alleged, respectively, that the defendants failed to pay benefits owed to the plaintiffs under the Severance Plan and that the defendants' "blocking policy" violated 29 U.S.C. § 1140 in that it was "intentionally calculated to prevent Plaintiffs from continuing their employment with ANC and thereby maintain superior employee benefits with ANC, as well as attain various benefit enhancements." These are the counts that the district court dismissed for failure to exhaust internal plan administrative appeals—an

omission that the plaintiffs concede and have attempted to excuse.

While a requirement to exhaust internal plan remedies is not specifically written into ERISA, courts have held that exhaustion is ordinarily a useful prelude to a lawsuit. See *Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir.1996) (citing cases). Several compelling reasons support this position: the plan's own review process may resolve a certain number of disputes; the facts and the administrator's interpretation of the plan may be clarified for the purposes of subsequent judicial review; and an exhaustion requirement encourages private resolution of internal employment disputes. *Id.* Thus, we held in *Lindemann*, "the law of this Circuit remains that the decision to require exhaustion as a prerequisite to bringing a federal lawsuit is a matter within the discretion of the trial court and its decision will be reversed only if it is obviously in error." *Id.*

Recognizing the hurdle posed by the exhaustion requirement, the plaintiffs tried at the thirteenth hour to file administrative appeals by sending a letter to counsel for ANC during the pretrial phase of this lawsuit. ANC remained open to considering the request, but it asked in its reply for more details about each plaintiff's claim so that it could make individual determinations on their cases. Plaintiffs' counsel never supplied those details, and so the belated attempt at exhaustion fell flat.

■ Both before the district court and here, plaintiffs placed their hopes on trying to prove that they should have been excused from exhausting plan remedies, either because recourse to those remedies would have been futile or because they were denied meaningful access to claims procedures. As we noted in *Lindemann*, "[i]n order to come under the futility exception to the exhaustion requirement a plaintiff must show that 'it is certain that [her] claim will be denied on appeal, not merely that [she] doubts that an appeal will result in a different decision.'" *Id.*, quoting *Smith v. Blue Cross & Blue Shield United of Wis.*, 959 F.2d 655, 659 (7th Cir.1992). The plaintiffs claim in their appellate brief that it is in fact certain that their claims would be denied because ANC acted in bad faith throughout 1995 and 1996 when it failed to furnish the information they were requesting. Plaintiffs also point to the facts that the ANC defendants are themselves the decisionmakers charged with evaluating claims, that they have breached their fiduciary duties to the plaintiffs, and that ANC is opposing the plaintiffs' position on Counts IV and VI in this lawsuit.

■ The last of these points is surely no reason to conclude that internal remedies would have failed, assuming any of the plaintiffs would have been able to demonstrate their factual and legal eligibility for either of the programs at issue. Perhaps some of them could have done so; we will never know. But it would be bizarre indeed to find that ANC's price for prevailing on the exhaustion argument is that it is estopped from urging the interpretation of the plan that it believes is correct. Furthermore, for reasons we explain below, the plaintiffs did not show that ANC breached its fiduciary duties to them. The claims about lack of information are also without merit, for the same reasons we are affirming the district court's finding on ANC's duties under ERISA to furnish information to the plaintiffs. Finally, the fact that the individual named defendants would be the people reviewing the plaintiffs' administrative appeals is not enough to relieve plan participants of the duty to exhaust remedies. See *Robyns v. Reliance Standard Life Ins. Co.*, 130 F.3d 1231, 1238 (7th Cir. 1997) (absence of neutral arbitrator not determinative of futility of administrative remedy); *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 460 (7th Cir.1986) (same); see also *Springer v. Wal–Mart Associates' Group Health Plan*, 908 F.2d 897, 901 (11th Cir. 1990).

■ We also find that the plaintiffs have not shown that they were denied meaningful access to the claims procedures. They had in their possession numerous documents and publications instructing them how to proceed, including the SPD and a complete description of these procedures in the employee handbook. The company gave them ample advance notice, both orally and in writing, of the changes it planned to implement, and

they had plenty of time in which they could have brought an internal complaint before the plan administrators. This falls well short of the kinds of denials of access that have excused exhaustion in earlier cases. See, e.g., *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 402–04 (7th Cir.1996); *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 690–91 (7th Cir.1992).

Especially because we review district court decisions to require exhaustion under an abuse of discretion standard, we see nothing that amounts to reversible error here. The district court conducted a thorough review of the entire dispute and concluded that the normal rule favoring exhaustion should apply here. Even if this appears to be closer to a pure question of plan interpretation than a case-by-case problem, this decision was well within the boundaries of its discretion.

## B. *Breach of Fiduciary Duty*

The essence of the plaintiffs' claim on this point is that the defendants placed their commercial interests above plan participants' benefit interests, and thereby breached their fiduciary duty to the plaintiffs. They assert that Bankowski affirmatively deceived the plaintiff group when he and other ANC representatives characterized the Silgan benefit package as "very comparable" to ANC's. They also claim that ANC personnel belittled their questions about the transition, failed to be as responsive as they should have been, and hid details about the Silgan plans that they should have disclosed.

■■■ This argument fails to acknowledge one of the fundamental principles of ERISA plan management, which the Supreme Court established in *Lockheed Corp. v. Spink*, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996), and reaffirmed as recently as January 1999 in *Hughes Aircraft Co. v. Jacobson*, —— U.S. ——, 119 S.Ct. 755, 762–64, 142 L.Ed.2d 881 (1999): ERISA fiduciaries are allowed to wear more than one hat, and when employers make design changes in plans, they are not wearing their fiduciary hats. *Lockheed*, 517 U.S. at 890, 116 S.Ct. 1783. Similarly, when company representatives are negotiating the sale of a division, they are not acting in their capacity as a plan fiduciary, and thus they do not bear the legal obligations that go along with fiduciary status. *Cf. Systems Council EM–3 v. AT & T Corp.*, 159 F.3d 1376, 1379–80 (D.C.Cir.1998) (finding that administrators of AT & T's pension plan were not acting in their capacities as fiduciaries while helping to reorganize AT & T's corporate structure by spinning off operations into separate businesses). Recently, in *McNab v. General Motors Corp.*, 162 F.3d 959 (7th Cir.1998), we considered a challenge to an early retirement system that General Motors made available only to selected employees. We held there that an employer is entitled to design a plan any way it likes, as long as it is willing to pay the cost (either directly or in terms of employee morale). *Id.* at 961–62. That is all that happened here. Plaintiffs wish that ANC had designed its transitional programs so that their group would be entitled to the bridging benefits given to the corporate staff department, or at least to the extra credit for ANC pensions that the unionized employees won for themselves. But in order to maximize the value of Food Metal when it conveyed that division to Silgan, ANC chose to structure its plan differently. This is a design decision, not a decision implicating an individual's rights to specific benefits, and as such, ANC was free to make it for business reasons.

■■ We also see no breach of fiduciary duty in the comments ANC representatives made about the rough comparability of the ANC and Silgan benefits packages. Plaintiffs have tried to squeeze themselves under the rule of *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), but like the district court, we find *Varity* distinguishable. In that case, Varity representatives had affirmatively misled employees into believing that a transfer to a new company would have no effect on their benefits. Varity knew at the time that the new entity was likely to be a loser. Critically, the district court found as a fact that the employer's representatives were acting in their capacity as fiduciaries when they falsely assured the employees that their benefits would not be threatened by the transfer. *Id.* at 506, 116 S.Ct. 1065. Under those circumstances, the Supreme Court found that Vari-

ty's conduct was governed by ERISA, and that it violated ERISA.

The facts here are nothing like those in *Varity*. There is not a shred of evidence that Silgan would not be able to provide its own benefits to the employees of Food Metal who made the switch. Every employee knew that he or she was not going to continue to receive ANC benefits for the future. To the extent they had specific questions about Silgan benefits, they had to rely on Silgan literature and Silgan fiduciaries. The information they had from ANC disclosed the fact that the two packages were not identical, and the statement that they were "comparable" cannot be seen as more than a general opinion ANC was offering. Some people might have liked the Silgan package better; others might have preferred ANC's. We cannot find that the statement about "comparability" is misleading under the circumstances, and we conclude that the district court correctly granted summary judgment to ANC on this count also.

### C. *Disclosure Issues*

Last, and most serious, is plaintiffs' claim that ANC violated its obligation under ERISA to disclose certain information. The statute requires that:

> [t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description,, [sic] and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instrument under which the plan is established or operated.

29 U.S.C. § 1024(b)(4). If an administrator violates that rule, it is subject to fines under 29 U.S.C. § 1132(c)(1).

Plaintiffs' counsel wrote to ANC first on behalf of one client, and next for all 168. In the first letter, he requested the following: ERISA pension plans, contribution plans, severance plans, and welfare benefit plans; any trusts relating to those plans; summary plan descriptions and annual reports for those plans; "[a]ny other documents under which the plans ... are established or operated, which could reasonably be anticipated to have an impact on the benefits provided,

or to be provided, to any plan participant"; the identity and corporate position of the named fiduciaries of the plans; minutes of meetings during which the plans were adopted or amended; and the sale agreement between ANC and Silgan. The request specified that it was for the documents as they existed on the sale date, July 30, 1995, and on December 30, 1994.

In response, ANC's counsel took what could charitably be called a conservative approach, one not entirely in keeping with the spirit of disclosure that animates the statutory rule. He provided various plans and SPDs, but he did not furnish the Severance Plan. Not satisfied, the plaintiffs requested (again) the Severance Plan, the restructure support program, a variety of plans covering one plaintiff (identified by plan number), the identity of the plan fiduciaries, copies of the agreement between ANC and the union regarding benefits paid to unionized workers, and (again) the minutes of board meetings and the ANC–Silgan sales agreement. ANC dug in at that point and replied that it had already furnished everything required by statute.

The legal question on which this dispute turns is how broadly we should construe the catch-all part of § 1024(b)(4), which requires disclosure of "other instruments under which the plan is established or operated." Other courts of appeals have found that the use of the term "instruments" implies that the statute reaches only formal legal documents governing a plan. See *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 652–54 (4th Cir.1996); *Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 142–45 (2d Cir.1997). Plaintiffs argue that this interpretation of the requirement is too narrow, and that they should have a right to all documents that provide information about a plan and its benefits. We agree with our sister circuits that the latter interpretation would make hash of the statutory language, which on its face refers to a specific set of documents: those under which a plan is established or operated. If it had meant to require production of all documents relevant to a plan, Congress

could have said so. This is not to say, of course, that companies have a permanent privilege against disclosing other documents. It means only that the affirmative obligation to disclose materials under ERISA, punishable by penalties, extends only to a defined set of documents. If litigation comes along, then ordinary discovery rules under the management of the district court provide the limits on what must be produced. It is possible, of course, that this narrow reading of § 1024(b)(4) may create an incentive at the margins for plaintiffs to litigate rather than to rest satisfied with the internal remedies offered by a plan, so that they can find out what else is influencing the administrator's interpretation of a plan. Companies with a more generous view of their own obligations and self-interest may seek to counteract that incentive by disclosing more rather than less in response to employee requests.

▆▆ Under this rule, we agree with the district court that ANC was not required to disclose the sale agreement or the board resolutions. We consider the question of plaintiffs' rights to the 1988 Pension Plan provision that grandfathered certain pension plan benefits to 1988 plan members a close call. This was an instrument under which the plan was established or operated, and as such it did not lack for the formality called for by § 1024(b)(4). On the other hand, ANC claimed that it had not produced that document for the simple reason that it did not realize that plaintiffs wanted it. The plaintiffs argued that it should have been produced under the request in their first letter for anything that "could reasonably be anticipated to have an impact on the benefits provided." When they asked more formally for the document, ANC produced it on the next business day. The district court held that the first request was not specific enough to put ANC on clear notice of what information the plaintiffs sought, citing *Anderson v. Flexel Inc.*, 47 F.3d 243, 248 (7th Cir.1995). Under the circumstances, we cannot disagree with the district court's application of the "clear notice" standard, and in any event, the delay at this point strikes us as harmless, even if ANC should have realized that plaintiffs wanted those parts of the 1988 Plan.

▆▆ The district court also concluded that plaintiffs had no right to learn the names of the individual fiduciaries because that list was not a constitutive document or a document under which the plan was managed. This is also a close call. The plan, as it is entitled to do under ERISA, 29 U.S.C. § 1002(21)(A), states that the Retirement Board will serve as its administrator. Yet boards do nothing in themselves—it is the people who make up the board who take all necessary decisions. The document appointing certain individuals to the board could be seen as one of the instruments that is pertinent to the operation of the plan. Here, the plaintiffs did know the names of two of the individuals on the board because they addressed inquiries to those individuals by name. More importantly, they have cited no cases indicating that disclosure of the names of members of the "unincorporated organization, association, or employee organization" permitted to be an administrator by ERISA is automatically required under § 1024(b)(4).

We are not persuaded that imposition of the kind of potentially sweeping disclosure requirement the plaintiffs want is necessary in order to implement the disclosure mandate of § 1024(b)(4), at least in the absence of any allegation that the identities of the individuals mattered. This kind of information too is available in discovery once litigation has begun if it meets the relevancy standards of Federal Rule of Civil Procedure 26(b)(1). Employers will just have to decide how close they want to come to the brink of suit when they make decisions about publicizing the names of the particular individuals who serve as fiduciaries for the employees as part of an institutional board.

▆▆ Last, the district court agreed with the plaintiffs that ANC violated § 1024(b)(4) when it failed to give them a copy of the Severance Plan upon request. Nevertheless, it declined to impose a fine on ANC because it found that ANC had acted in good faith, that the plaintiffs were not prejudiced by the omission because all relevant sections of the Severance Plan were reproduced verbatim in the employee handbook, and that a fine was not necessary to further any purpose of ERISA. Fines under

§ 1032(c)(1) are not mandatory, even if there has been a violation of § 1024(b)(4). We review the district court's decision not to impose a fine only for abuse of discretion. 29 U.S.C. § 1132(c)(1); see also *Harsch v. Eisenberg*, 956 F.2d 651, 662 (7th Cir.1992). In light of the district court's observation that the plaintiffs already had the relevant sections of the Severance Plan available to them in the handbook, we find no abuse of discretion here. However, we emphasize that fines may be necessary to make employers take seriously their disclosure obligations when an actual lack of information results from the employer's reluctance to respond to a request for information.

The judgment of the district court is AF-FIRMED.