**Susan E. HESS, Plaintiff,**

v.

**HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY and Fleet Financial Group, Inc., Defendants.**

No. 97–2051.

United States District Court,
C.D. Illinois,
Danville/Urbana Division.

March 22, 2000.

Glenn A. Stanko, Rawles, O'Byrne, Stanko & Kepley, Champaign, IL, for plaintiff.

Peter R. Bulmer, Jackson, Lewis, Schnitzler & Krupman, Chicago, IL, for defendant Fleet.

Joseph J. Hasman, Donald A. Murday, Joshua L. Smith, Peterson & Ross, Chicago, IL, for defendant.

## ORDER

McCUSKEY, District Judge.

On March 18, 1997, Plaintiff Susan Hess filed a complaint against Defendants Hartford Life and Accident Company ("Hartford") and Fleet Financial Group, Inc ("Fleet") alleging three violations of the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1001 *et seq.* Count I alleged that Hartford violated 29 U.S.C. § 1132(a)(1)(B) & (a)(3). Count II alleged that Fleet breached its fiduciary duty to Plaintiff under 29 U.S.C. § 1109(a). Finally, Count III alleged that Fleet violated 29 U.S.C. § 1132(a)(1)(A) & (c)(1).

On September 19, 1997, the court dismissed Count II on the recommendation of the Magistrate Judge. Thereafter, the parties agreed to submit the case to the court for a decision on stipulated facts.[1] A statement of undisputed facts was filed as to each defendant, and the parties filed briefs in support of their respective positions. The matter is now before the court for judgment on the stipulated facts.

## BACKGROUND

The following facts are drawn from the parties' statements of stipulated facts. Hess worked for Fleet Mortgage Company as a loan officer from December 8, 1986 through April 19, 1996, when multiple sclerosis rendered her disabled. During that time, Hess participated in a group long-term disability ("LTD") plan administered

---

1. After the parties submitted statements of stipulated facts and briefs for judgment by the court, they participated in settlement conferences with the court's assistance. After attempts to settle failed, however, the judge originally assigned to the case, Judge Harold Baker, recused himself on February 9, 2000. Chief Judge of the Central District of Illinois Joe Billy McDade then assigned the matter to Judge Michael McCuskey.

by Defendant Fleet, which is the parent company of Fleet Mortgage Company. Under this policy, Hartford provided group LTD insurance to eligible participants in Fleet's plan. Hartford relied on Fleet to remit premiums and information for covered individuals. The policy provided that if Fleet gave Hartford any incorrect information, no person would be deprived of insurance to which she was otherwise entitled or receive benefits to which she was not otherwise entitled.

Under the policy, Hartford has authority to determine eligibility for benefits and to interpret the policy. The policy provides that a participant is paid a monthly benefit if she becomes disabled while insured under the plan. A "monthly benefit" is defined as a "monthly sum payable to you while you are disabled, subject to the terms of the Group Insurance Policy." In Hess' case, the monthly benefit is her monthly rate of basic earnings multiplied by a benefit percentage set out in the schedule of insurance minus all other income benefits. The "monthly rate of basic earnings" ("MRBE") means a participant's regular monthly pay excluding "commissions, bonuses, overtime pay, or any other fringe benefit."

In 1995, Hess worked for Fleet as an outside loan originator under a written agreement that provided that benefits would be founded upon "base compensation." Base compensation was defined as annualized draw paid on a bi-weekly basis to all plan participants. A "draw" was an advance against anticipated commission payments. Commissions were paid on the basis of points on the amounts of loans procured by the loan officer. Although total compensation was the loan officer's draw plus her commissions reduced by the amount of the draw, the agreement provided that only the draw would be used as the benefit base for calculating the loan officer's LTD coverage.

In 1996, Hess and Fleet entered into a new written agreement defining the benefits for all outside loan officers. This agreement was executed on January 2, 1996, but was to be in effect from January 1, 1996 through December 31, 1996. The 1996 agreement provided that the base salary and draw would be the only basis for determining benefit levels, including long-term disability, and excluded from that determination extra pay or other forms of extra compensation. Other than bonuses, commissions were the only other form of compensation payable to Hess on a biweekly or monthly basis. "Commissions" were defined as "compensation payable to the participant on closed loans." The agreement did not, however, define "base salary" or "base compensation." As under the previous agreement, "draw" was defined as "an advance against commission payments." However, the new agreement also provided that the draw was to be terminated on April 5, 1996.

Fleet, however, postponed the elimination of the draw until June 1, 1996. At that time, Fleet stipulates, the base for determining LTD benefits became a participant's average earnings over two prior calendar years, including commissions. Fleet employees opting for LTD coverage were to pay the entire premium cost through automated payroll deductions. Accordingly, once the draw was terminated, Hess' bi-weekly LTD insurance deductions increased from $8.73 to $16.87 based upon her prior earnings. Up until that time, Fleet had forwarded premiums to Hartford under the 1995 compensation agreement, which was based entirely on the amount of Hess' draw.

Because Fleet had failed to eliminate the draw on April 5, 1996 as originally planned, Hess' compensation was based solely on commissions against which she had a bi-weekly draw at the time she became disabled on April 19, 1996. On October 16, 1996, Hess was found eligible for LTD benefits under the policy. At that time, Hartford informed her that she would be entitled to receive a monthly benefit of $1300, which was two-thirds of her calculated monthly income of $1950.

Hartford representative Dan Gerbino explained that Hess' benefits had been determined based on Fleet's LTD data form, which stated that her annual salary was $23,400. Gerbino did not request the earnings figures from Fleet. He instead relied solely on the LTD data form for Hess' salary information, and therefore did not know that Hess' salary was based on commissions.

On December 2, 1996, Hess appealed the benefits determination to Fleet, arguing that her monthly benefit was calculated incorrectly. To this appeal, Hess attached her 1995 and 1996 agreements with Fleet. Fleet then forwarded the appeal to Gerbino on January 16, 1997.

Gerbino, who no longer works for Hartford, worked solely on Fleet employees' benefits claims at the time of Hess' appeal. As well as making a decision on Hess' initial claims for benefits, he also considered her appeal. On December 30, 1996, Gerbino talked to Fran DelSesto of Fleet's corporate benefits office who explained that Hess' earnings were based entirely on commissions, and that Fleet had originally used a draw against her salary base so that she would be covered under the plan. Nevertheless, she explained, Fleet intended fully-commissioned loan officers like Hess to be covered under the Fleet LTD plan.

Gerbino then reviewed the plan and concluded that commissions were excluded from the calculation of a participant's MRBE. Despite DelSesto's explanation of Fleet's intention to include fully-commissioned loan officers, Gerbino concluded that participants whose sole source of income derived from commissions were excluded from coverage under the terms of the policy. At this point, Gerbino considered three possible options: recalculate the Hess' MRBE using her income tax forms, continue to use the Fleet draw amount to calculate benefits, or discontinue benefits entirely. He chose the second option, reasoning that Fleet had not treated the draw payments as commission earn-

ings in light of the amount of premiums it had forwarded on Hess' behalf. Moreover, Gerbino testified, he believed that Hess' benefits were limited by those premiums.

When Gerbino made this decision, however, he did not know about the June 1, 1996 changes in calculating the basis for benefits, and therefore did not know that these changes were supposed to have been implemented before Hess became disabled. In his deposition, he admitted that if he had known this information, it may have influenced his decision on Hess' claim. Moreover, Gerbino did not consider the arguments Hess made in her written appeal and did not have a copy of her agreements with Fleet. Gerbino testified that he would have considered those documents if he had received them, but admitted that he never requested them. Gerbino explained that he determined claims based on the facts existing at the time of the disability. Nevertheless, if changes to Hess' benefit base should have taken place before she became disabled under the 1996 agreement, that fact would have influenced his decision on Hess' claim.

Meanwhile, Hess had sought copies of a number of documents from Fleet. Fleet received this request on December 6, 1996, but did not acknowledge its receipt until January 16, 1997. In that acknowledgment, Fleet advised Hess that Hartford would provide her with a copy of the group LTD policy, but did not discuss the other documents Hess had requested. That same day, Fleet asked Hartford to send Hess a copy of the LTD policy. On March 3, 1997, Hartford gave Hess' counsel a copy of the group certificate of insurance. That group certificate, however, did not represent the entire LTD policy. Hess eventually received a copy of the full policy when Hartford filed its answer in this lawsuit on June 17, 1997. Fleet, however, did not provide Hess with a copy until February 6, 1998, as part of discovery in this case, even though it had the complete LTD policy at the time it received her request. Likewise, Fleet failed to produce the re-

maining documents that Hess had requested until April 17, 1998, in response to a request to produce.

## ANALYSIS

### I. Count I: Hartford's Liability for Past and Future Benefits under ERISA

 Courts reviewing a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) employ a *de novo* standard of review unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If a plan confers such discretion on a fiduciary, the court must employ an arbitrary and capricious standard of review. *See Firestone Tire,* 489 U.S. at 111, 109 S.Ct. 948; *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan,* 102 F.3d 1435, 1437 (7th Cir.1996).

In this case, the parties agree that the plan confers discretion, and accordingly that the court must employ an arbitrary and capricious standard of review. The Seventh Circuit has explained that a "decision is arbitrary or capricious only when the decisionmaker has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence . . ., or is so implausible that it could not be ascribed to difference in view or the product of . . . expertise." *Trombetta,* 102 F.3d at 1438. Before concluding that a decision is arbitrary and capricious, a court "must be very confident that the decisionmaker overlooked something important or seriously erred in appreciating the significance of evidence." *Wahlin v. Sears, Roebuck & Co.,* 78 F.3d 1232, 1235 (7th Cir.1996) (*quoting Patterson v. Caterpillar, Inc.,* 70 F.3d 503, 505 (7th Cir.1995)). However, "[i]f the trustee makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts . . . then the trustee's decision is final." *Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund,* 900 F.2d 1138, 1143 (7th Cir.1990).

The dispute in this case involves Hartford's calculation of Hess' MRBE, which provides the basis for determining the amount of her monthly benefit. Hartford based its initial decision solely on Fleet's previous method of compensation, as set forth in the 1995 agreement, because Fleet failed to inform Hartford that it had a new compensation agreement with Hess. The original compensation system provided that draws, which were regular advances of anticipated commissions, would form the basis for LTD coverage. Under that system, commissions were excluded as "extra pay" from the calculation of benefits. According to Hess, however, she is entitled to a monthly benefit based on the benefit level set forth in her 1996 agreement with Fleet. In contrast to the 1995 agreement, the latter agreement provided that Hess' compensation would be based entirely on the commissions she earned, and that the draw would be eliminated. Benefits would then be based on average earnings over the two years preceding a claim for benefits.

Thus, instead of basing its decision on the compensation agreement in effect at the time Hess became disabled, Hartford based it on the outdated compensation system. Yet despite its ignorance of the new compensation agreement, Hartford argues that its decision to calculate Hess' benefits based on her draw was reasonable. In support of this argument, Hartford points to the plan's language defining MRBE, which reads as follows:

Monthly Rate of Basic Earnings means your regular monthly pay . . . not counting:

(1) commissions;

(2) bonuses;

(3) overtime pay; or

(4) any other fringe benefit or other extra compensation

Hartford argues that this language unambiguously excludes commissions from the definition of MRBE. Because Hess' compensation under the 1996 agreement was based solely on commissions, Hartford concludes, she was not entitled to the additional monthly benefit she seeks.

Hartford's argument is not persuasive. To extend Hartford's interpretation of the plan to its logical conclusion, Hess would not be entitled to any disability compensation under the 1996 agreement. This interpretation defies the clear intent of the parties. No one disputes that Hess was an intended beneficiary of the plan, or that the 1996 agreement provided that Hess' sole source of compensation was the commissions that she earned. Yet Hartford asks this court to interpret the plan, which was clearly intended to include Hess, as one that would exclude her. A far more logical interpretation of the plan's exclusion of "commissions" is that the plan was not intended to include in the calculation of MRBE commissions earned as extra pay. In this case, however, the 1996 agreement provided that commissions were Hess' only source of pay. To exclude them from the determination of Hess' MRBE would defy the clear intent of the parties that Hess be covered.

It is true that Fleet delayed in eliminating the draw until June of 1996. Nevertheless, Fleet's delay should not alter its January 1, 1996 contract to provide Hess with certain benefits, and to eliminate the draw on April 5, 1996, which was before she became disabled. That contract set forth the terms and conditions of Hess' employment and also the basis for benefit levels. It provided that Hess' compensation was to be based solely on commissions. As commissions were her only pay, they could not logically constitute "extra pay" under the terms of the agreement. Thus, Fleet fully intended that an employee who earned nothing but commissions be covered by the policy, and it was Fleet's obligation to provide Hartford with accurate earnings figures of its covered employees.

Hartford's reliance on *White v. E & F Distr. Pension Plan*, 922 F.Supp. 132 (C.D.Ill.1996), does not persuade this court to accept its position that commissions were excluded. In *White*, the parties disputed whether the plaintiff, a retired traveling salesmen who had earned only commissions, was covered under his former employer's pension pan. The plan at issue in *White* specifically included only "salaried employees" in the class of employees eligible to participate, and there was no evidence suggesting that the employer ever intended to cover fully-commissioned employees like the plaintiff. Based on that, the court concluded that the administrator was reasonable in concluding that the plan did not cover the plaintiff. *White*, 922 F.Supp. at 138–39.

As in *White*, this case also concerns a commissioned employee seeking benefits from a plan. However, in contrast to *White*, the parties in this case do not dispute that they intended to include Hess as a participant in the plan, even though her pay was based on commissions. Moreover, the undisputed facts show that Hartford was operating under a mistake of fact as to Hess' compensation agreement with Fleet when it calculated her benefits. In contrast, the plan administrator in *White* did not base its decision on inaccurate information.

■ In this case, Hartford necessarily overlooked an important aspect of the problem because, for whatever reason, Fleet did not supply accurate information as to the basis of Hess' compensation. To reach this conclusion, the court need not secondguess the decision-maker's thought processes or resolve whether he should have sought more information; nor must it question whether he acted with a bias in favor of Hartford's bottom line. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Protec. Plan*, 195 F.3d 975, 982

(7th Cir.1999) (cautioning courts not to look to mental processes of the decision-maker in determining whether a decision was arbitrary and capricious). The court may avoid that inquiry altogether because the undisputed facts demonstrate that regardless of how the decision-maker processed the information before him, that information was inaccurate. In sum, Hartford based its decision regarding Hess' compensation on misinformation, which led it to reach a decision as to her benefits that was arbitrary and capricious.

Having concluded that Hartford's determination of benefits was arbitrary and capricious, the court must now decide the appropriate remedy. Hess asks the court to award back benefits based on the benefit-based salary figure Fleet used as of June 1, 1996, when it belatedly eliminated the draw. She also requests that the court order Hartford to pay her future monthly LTD benefits based on the 1996 agreement. Hartford, on the other hand, argues that a remand is the better remedy.

 Remand is not the proper remedy if the case is "so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir.1996), *cert. denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). For example, remand would be inappropriate if no factual determination remained to be decided. *Quinn v. Blue Cross and Blue Shield Ass'n,* 161 F.3d 472, 477 (7th Cir.1998) (*citing Canseco v. Construction Laborers Pension Trust for Southern Cal.,* 93 F.3d 600 (9th Cir. 1996), *cert. denied,* 520 U.S. 1118, 117 S.Ct. 1250, 137 L.Ed.2d 331 (1997)). Remand would also be inappropriate if an administrator's selective review of the relevant evidence was arbitrary and capricious. *Quinn,* 161 F.3d at 477 (*citing Govindarajan v. FMC Corp.,* 932 F.2d 634 (7th Cir. 1991)). In those cases, an award of retroactive benefits is the proper remedy.

There is no need for a remand in this case. The parties do not dispute that Hess is disabled and entitled to benefits. The only dispute involves the monthly benefits to which she is entitled based on her MRBE. The court has determined that the MRBE must be based on her 1996 agreement, which provided that benefits were to be based on average earnings over the two years preceding a claim for benefits. When Fleet determined her short-term benefits using that basis, it arrived at the figure $45,223.88. Hartford was dependent on Fleet to provide an earnings figure, and that figure was supposed to be the same for determining both short- and long-term disability benefits.

Accordingly, Hess' benefits should be based on the figure $45,223.88, which yields a MRBE of $3768.65. The two-thirds (66.67%) monthly benefit for that MRBE is $2512.55. The court therefore orders Hartford to pay Hess the difference between that amount and the $1300 monthly benefit paid since she began receiving LTD benefits, and to pay the proper monthly benefit in the future. The record indicates that Hartford has paid Hess monthly disability benefits since October 1996. Accordingly, she has received a total of forty-two benefit checks in the lesser, incorrect amount of $1300, including the check the court presumes she has or will receive shortly for March 2000. She is therefore due back benefits of $1212.55 for each of those forty-two months, for a total of $50,927.10. Beginning with her April 2000 benefits check, Hartford must pay Hess a monthly benefit of $2512.55, adjusted for whatever social security benefits Hess receives.

## II. *Count III: Fleet's Liability for Failing to Produce Requested Documents*

In Count III, Hess claims that Fleet violated its obligation under ERISA to disclose certain information. At all times relevant to this proceeding, ERISA required that an administrator "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description,

and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instrument under which the plan is established or operated." 29 U.S.C. § 1024(b)(4) (West 1996), *amended by* 29 U.S.C. § 1024(b)(4) (West 1997) (striking "plan description"). An administrator has thirty days to honor a request made under subsection 1024(b)(4), and is subject to fines of up to $100 for each day past the deadline that it fails to comply. 29 U.S.C. § 1132(c)(1) (West 1996).

On December 2, 1996, Hess' attorney sent Fleet a letter requesting certain documents. Specifically, the letter read as follows:

> Request is hereby made for a copy of the long-term disability plan of Fleet Financial Group as it existed on January 1, 1996 and thereafter. I am seeking a copy of the plan itself, not a summary plan description, which we already have. I am also seeking all amendments made to the plan after January 1, 1996 to the present.

> Request is also made for a copy of all contracts relating to the long-term disability plan of Fleet Financial Group which were in effect on January 1, 1996 or thereafter. Again, this request includes any amendments or changes made after January 1, 1996.

> Request is further made for a copy of all internal regulations, policies, or rules relating to the application or interpretation of the Fleet Financial Group long-term disability plan. As before, I am seeking copies of those regulations, policies, or rules which were in effect on or after January 1, 1996, including any amendments made after that date.

> Finally, request is made for a copy of all records and documents relating to Ms. Hess' claim for disability under Fleet Financial Group long-term disability plan. Any records of correspondence received from the employer or the insurance carrier should be included.

Fleet received this letter on December 6, 1996. Although the letter specifically mentioned the thirty-day deadline for compliance, Fleet did not respond until forty-one days later, on January 16, 1997. In its response, Fleet merely acknowledged receipt of Hess' letter, but did not supply the requested documents. Instead, it advised Hess that the policy served as the plan document, and also that it was asking Hartford to provide her with a copy of the policy. That same day, Fleet wrote to Hartford requesting that it send Hess a copy of the policy. Neither Fleet's response to Hess nor its letter to Hartford, however, addressed the other requested documents.

Around March 3, 1997, Hartford gave Hess' counsel a copy of the group certificate of insurance. This certificate of insurance, however, did not represent the entire LTD policy. Because it was incomplete, it lacked some of the information included in the full policy. For instance, the group certificate did not include provisions regarding premium rates, nor did it address the consequences of the policyholder's provision of misinformation.

Hess eventually received the complete policy when Hartford attached a copy to its answer in this case on June 17, 1997, which was 163 days after the thirty-day limit had passed. Fleet itself did not provide Hess with a copy until it made its Rule 26(a)(1) disclosures on February 6, 1998, which was 396 days late. Moreover, Fleet did not provide additional information that Hess sought until 466 days after the deadline, on April 6, 1998. That information included the standard Fleet LTD data form that Fleet used to transmit information to Hartford regarding Hess' earnings, as well as documents relating specifically to the processing of Hess' claim for benefits. In addition, Fleet also failed to provide documents relating to its 1996 change in how it determined the benefit base for commissioned loan officers. Based on those delays, Hess seeks statutory penalties of $100 for each of the 466

days Fleet delayed in providing her with all the information she requested.

■ A request for documents under subsection 1024(b)(4) necessitates a response from the plan administrator when it provides clear notice of what information the beneficiary desires. *Anderson v. Flexel, Inc.*, 47 F.3d 243, 248 (7th Cir.1995) (*citing Moothart v. Bell*, 21 F.3d 1499, 1503 (10th Cir.1994); *Curry v. Contract Fabricators Profit Sharing Plan*, 744 F.Supp. 1061, 1066 (M.D.Ala.1988), *aff'd*, 891 F.2d 842 (11th Cir.1990)). Although the request must be clear, an administrator's knowledge of surrounding circumstances or the information being requested may require a response to an otherwise general request. *See Boone v. Leavenworth Anesthesia, Inc.*, 20 F.3d 1108, 1111 (10th Cir.1994). Moreover, the request need not ask for specific documents by name, and an administrator cannot use such technical considerations as an excuse for its failure to respond. *Anderson*, 47 F.3d at 250 (*citing Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1071 (6th Cir.1994)).

■ As noted above, subsection 1132(c)(1) imposes a thirty-day time limit upon an administrator to respond, and a court may impose penalties of up to $100 a day from the date of the administrator's refusal or failure to respond. The purpose of ERISA's penalty provision is "not so much to penalize as to induce plan administrators to respond in a timely manner to a participant's request for information." *Winchester v. Pension Comm. of Michael Reese Health Plan, Inc.*, 942 F.2d 1190, 1193 (7th Cir.1991). In determining whether to award a penalty for disclosure violations under ERISA, a court should consider the conduct and intent of the administrator in not providing the relevant information, and the harm or prejudice suffered by the participant from the administrator's failure to furnish the required information. *Harsch v. Eisenberg*, 956 F.2d 651, 662 (7th Cir.1992) *cert. denied*, 506 U.S. 818, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992); *Kleinhans v. Lisle Sav.*

*& Profit Sharing Trust*, 810 F.2d 618, 622 (7th Cir.1987).

Here, the documents at issue are (1) the LTD plan; (2) the LTD data form; (3) documents relating to changes in the way Fleet determined benefit base levels for commissioned loan officers; and (4) documents relating to Fleet's processing of Hess' claim. Fleet concedes that it was required to provide Hess with the LTD plan, but argues that no penalties are warranted. As for the other documents, Fleet argues that it was not required to turn them over under subsection 1024(b)(4).

The court will address Hess' claim as it relates to the LTD plan first. As noted above, there is no dispute that the LTD plan is the type of document ERISA requires plan administrators to provide within thirty days upon request. Fleet offers no explanation for its failure to provide the plan. Nevertheless, Fleet argues that penalties are not warranted for this delay because it did not act in bad faith. Moreover, Fleet asserts, Hess suffered no prejudice, and asked for the document only once before filing suit.

In response, Hess points out that her request was clear, and that the statute requires nothing more than a single, clear request to invoke Fleet's obligations. Moreover, she argues, although she is not required to prove that she was prejudiced, Fleet's failure to turn over a copy of the LTD plan did in fact prejudice her. In particular, she asserts, having possession of the plan might have assisted her in appealing the initial benefits determination. In addition, if her counsel had been given the opportunity to review the full LTD plan before filing suit, Hess would not have brought Count II, which was ultimately dismissed by this court on Fleet's motion.

■ The court need not find bad faith to impose penalties. Bad faith is merely one factor that the court can properly consider in exercising its discretion. Likewise, the liquidated damages provision

of subsection 1132(c)(1) dispenses with the need to prove actual damages. *Krawczyk v. Harnischfeger Corp.*, 869 F.Supp. 613, 631 (E.D.Wis.1994), *aff'd* 41 F.3d 276 (7th Cir.1994). Thus, the court may, but need not, consider actual injury when exercising its discretion. If the court ultimately decides to impose a fine, the statute commits the size of that penalty to the court's discretion. *Ziaee v. Vest*, 916 F.2d 1204, 1210–11 (7th Cir.1990), *cert. denied*, 499 U.S. 959, 111 S.Ct. 1581, 113 L.Ed.2d 646 (1991).

■ It is undisputed that Hess was absolutely entitled to a copy of the LTD plan. And despite Fleet's assertion that it lacked bad faith, it has offered no justification for its failure to comply with ERISA's clear mandate. Moreover, the complete plan description contained much more information than did the summary plan description. This additional information could have helped Hess in considering her options and in seeking review of the initial disability benefits determination. Accordingly, some penalty is warranted for Fleet's unjustified failure to respond to Hess' legitimate request for information, notwithstanding Fleet's bare assertion that it lacked bad faith.

However, the court will not order Fleet to pay a penalty for the time following Hess' receipt of the plan from Hartford on June 17, 1997. Hess is correct that it was Fleet's responsibility to comply with her request. Nevertheless, after Hartford provided the document, Hess had what she was seeking. Once she had the plan, another copy from Fleet would not have helped her. Accordingly, although Fleet shirked its responsibility, the court will impose penalties only for the 163 days that passed between the thirty-day deadline and Hess' receipt of the plan from Hartford.

As for the other documents at issue, Fleet argues that they did not fall within subsection 1024(b)(4)'s mandate. Specifically, Fleet argues that the statute did not require it to produce documents relating to changes in the way it determined benefit base levels for commissioned loan officers, or those relating to Fleet's processing of Hess' claim. Likewise, Fleet argues, it had no duty to provide Hess with the LTD data form.

This issue essentially turns on how broadly the court construes the catch-all part of subsection 1024(b)(4), which requires disclosure of "other instruments under which the plan is established or operated." Hess urges the court to accept a broad interpretation of the language, citing *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1070 (6th Cir.1994). In that case, the Sixth Circuit Court of Appeals stated that "all other things being equal, courts should favor disclosure where it would help participants understand their rights." *Bartling*, 29 F.3d at 1070. She further points out that the documents she sought are similar to types of documents other courts have held must be disclosed upon request. *See Bartling*, 29 F.3d at 1070–71 (finding that subsection 1024(b)(4) encompassed benefit computations for plan participants); *Maiuro v. Federal Express Corp.*, 843 F.Supp. 935 (D.N.J.1994), *aff'd* 43 F.3d 1461 (3d Cir.1994) (finding that "other instruments" included information as to origin of current monthly benefit).

However, as Fleet points out, other circuits have found that the use of the term "instruments" implies that the statute reaches only formal legal documents governing a plan. *See Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 142–46 (2d Cir. 1997); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 652–54 (4th Cir.1996), *cert. denied*, 519 U.S. 1077, 117 S.Ct. 738, 136 L.Ed.2d 677 (1997). In *Ames v. American National Can Co.*, 170 F.3d 751 (7th Cir. 1999), the Seventh Circuit accepted the Second and Fourth Circuits' narrow interpretation of the term "instruments." In so holding, the court rejected interpreting the provision to require production of all documents relevant to a plan, finding that if Congress intended such a broad result, it

would have explicitly said so. *Ames,* 170 F.3d at 758–59. The court noted that if a matter proceeded to litigation, relevant documents not falling within the disclosure provisions would still be discoverable in the ordinary course of litigation. *Ames,* 170 F.3d at 759.

Accordingly, "other instruments" does not mean any document relating to a plan, but only formal documents that establish or govern the plan. In determining whether the other documents Hess requested were subject to disclosure, the court must consider whether those documents "allow 'the individual participant [to] know[ ] exactly where he stands with respect to the plan—what benefits he may be entitled to, what circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to whom the management and investment of his plan funds have been entrusted.'" *Hughes Salaried Retirees Action Comm. v. Administrator of the Hughes Non–Bargaining Retirement Plan,* 72 F.3d 686, 690 (9th Cir.1995), *cert. denied,* 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996) (*quoting* S.Rep. No. 93–127 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4838, 4863) (*cited with approval in Ames,* 170 F.3d at 758).

With that framework in mind, the court now turns to each of the specific categories of documents at issue. Hess argues that she was entitled to documents involving Fleet's change to the manner in which it determined benefit base levels for commissioned loan officers. These documents set forth when those changes were to go into effect, and their implications on participants' benefits levels. Fleet asserts that these documents do not fall within the Seventh Circuit's narrow interpretation of "other instruments" because they are not instruments under which the plan was managed. This is a close question. However, even under the Seventh Circuit's narrow interpretation of the statute, the court finds that these documents were the type of legal instruments under which the plan

was managed. A prerequisite to any benefits determination is a calculation of the benefits base. Changing the way in which that benefits base is calculated necessarily changes the way in which the plan is managed. *Cf. Werner v. Morgan Equip. Co.,* 15 Employee Benefits Cas. (BNA) 2295, 2301, 1992 WL 453355 (N.D.Cal.1992) (finding that stock valuation report was an instrument under which a plan is established or operated when the plan measures benefits by the value of stock); *Lee v. Dayton Power & Light Co.,* 604 F.Supp. 987, 1002 (S.D.Ohio 1985) (finding that manual containing charts essential to the calculation of benefits was an instrument under which the plan is established or operated).

Fleet argues that even if these documents were within the scope of the statute, Hess' request was not clear enough to invoke Fleet's obligations. This court does not agree. Hess' letter requested "all contracts relating to the long-term disability plan" and "all internal regulations, policies, or rules relating to the application or interpretation of the Fleet Financial Group long-term disability plan." Hess further requested any amendments to these contracts or rules. Because this letter also included her appeal, Fleet knew that Hess was contesting the way in which her compensation had been calculated for benefits purposes. In light of this information, it was clear that Hess was seeking any amendments to the way in which her benefits were calculated. *See Boone,* 20 F.3d at 1111.

However, the court cannot reach the same conclusion as to the remaining documents at issue. In particular, Hess also sought a copy of Fleet's LTD form, which Fleet used to transmit information to Hartford regarding Hess' earnings. Hess additionally sought any other documents relating to Fleet's processing of her claim. Hess asserts that these document played an important role in Hartford's decision on her disability claim and her sub-

sequent appeal, and therefore fell within the "other instruments" language of subsection 1024(b)(4). The court does not agree. Although useful to Hess, and certainly discoverable in litigation, these documents do not fall within the Seventh Circuit's narrow reading of subsection 1024(b)(4)'s "other instruments" language. However relevant to Hess' claim, documents relating to the particular claim of one claimant are simply not the sort of legal instruments under which the plan was managed.

For that reason, her claim that Fleet violated subsection 1024(b)(4) when it failed to turn over her LTD data form must also fail. The LTD data form is essentially a worksheet for providing information about an individual plan participant. Fleet completes the form, which it then forwards to Hartford for processing. The form provides identifying information about the covered employee, such as her name and social security number. It also provides information about her level of insurance benefits, and states her yearly salary. Thus, the LTD data form was used simply to transmit information pertinent to a particular claim; it was not a formal legal instrument governing the plan's operation or management. For the same reasons the court found that documents relating to Hess' particular claim did not constitute "other instruments," subsection 1024(b)(4) did not require Fleet to provide the LTD form to Hess within thirty days of her request.

In sum, the court concludes that Fleet violated subsection 1024(b)(4) by failing to provide Hess with either a copy of the plan or documents relating to the change in benefits base. As for its failure to produce the plan, the court has already determined that Fleet should pay a fine only for the 163 days following the thirty-day deadline before Hess received a copy from Hartford. The court must now determine how much that fine should be. Despite Fleet's assertion that it lacked bad faith, it demonstrated remarkably bad judgment and apa-

thy toward satisfying its unequivocal obligations to Hess. For that, it should pay a substantial penalty. Nevertheless, the court does not believe that Fleet's behavior was so extreme as to warrant the highest penalty of $100 a day, as Hess requests. Rather, the court finds that a penalty of $50 per day for each of the 163 days that Hess was forced to wait for her copy of the plan satisfies ERISA's objective of inducing administrators to honor their obligations under subsection 1024(b)(4). *See Winchester,* 942 F.2d at 1193.

The court does not believe, however, that Fleet's failure to produce documents relating to the change in benefits base warrants a penalty. As the court discussed above, whether Fleet was required to disclose these documents in the first place was a particularly close question with no Seventh Circuit precedent directly on point. Moreover, fines under subsection 1132(c)(1) are not mandatory, even if there has been a technical violation of subsection 1024(b)(4). *See Harsch,* 956 F.2d at 662. The court will therefore impose no fine for Fleet's failure to provide the benefits base documents. The $50 per day fine imposed for Fleet's failure to provide a copy of the plan should be an adequate lesson that Fleet must take seriously its disclosure obligations. *See Ames,* 170 F.3d at 760.

### CONCLUSION

Hess is entitled to judgment in her favor on Count I against Hartford. Accordingly, Hartford is ordered to pay Hess back benefits in the amount of $50,927.10, which includes benefits for March 2000. Beginning with her April 2000 disability check, Hartford must pay Hess a monthly benefit of $2512.55, adjusted for whatever social security benefits Hess receives.

Hess is also entitled to judgment against Fleet on Count III. The court orders Fleet to pay a penalty of $50 for each of the 163 days Hess had to wait for a copy of the

plan past Fleet's thirty-day deadline, for a total of $8150.

The Clerk of the Court is directed to enter judgment accordingly. This case is TERMINATED.