**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0599n.06**
**Filed: August 21, 2006**

**No. 04-6204**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JOHN R. ADAMS, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| LOCKHEED MARTIN ENERGY SYSTEMS, | ) | EASTERN DISTRICT OF TENNESSEE |
| INC., et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: BATCHELDER, GIBBONS, and COOK, Circuit Judges.

COOK, Circuit Judge. Plaintiffs, former employees of Defendant Lockheed Martin Energy Systems (LMES), appeal from the district court's order denying their motion for partial summary judgment and granting Defendant's motion for summary judgment. We affirm.

I. Background

Plaintiffs, before March 1, 1999, worked in the Information Technology Service (ITS) division at an LMES-operated nuclear facility. In 1998, LMES decided to "outsource" the ITS division whereby Plaintiffs would continue to perform essentially the same work but the successful bidder for the outsourcing contract would become their new employer.

LMES informed Plaintiffs about the planned outsourcing and published an "Expression of Interest" (EOI), setting forth "Participation Criteria" for companies interested in bidding for the outsourcing contract. The EOI required the successful bidder to provide "market competitive" benefits. After over 20 companies responded, LMES sent a request for proposal to the companies that satisfied the participation criteria. Three companies submitted bids. LMES employed a consulting firm to review and evaluate the compensation and benefits packages offered and concluded that all three bidders' packages were "market competitive." Ultimately, LMES awarded the contract to Science Applications International Corporation (SAIC).

LMES set March 1, 1999 as the target date for the outsourcing and told Plaintiffs that SAIC had represented in its bid that it would accept "rollover transfers" of their 401(k) plan balances. But in early February, SAIC realized that an IRS rule likely prohibited rollover transfers. LMES asked SAIC to consider allowing Plaintiffs to use "trust-to-trust" transfers, but SAIC refused, citing the increased administrative costs of such transfers, which it had not factored into its bid. The week before the planned outsourcing, LMES notified Plaintiffs that they would not be permitted to rollover their 401(k) balances and that when SAIC officially hired Plaintiffs, their 401(k) balances would remain with LMES. Soon after, Plaintiffs filed suit.

The district court granted LMES's motion for summary judgment on all claims. Plaintiffs appeal the summary judgment award with respect to three of their ERISA-based claims.

II. Discussion

We review a grant of summary judgment de novo, applying the frequently-cited Rule 56 standard. *Int'l Union v. Cummins, Inc*., 434 F.3d 478, 483 (6th Cir. 2006); Fed. R. Civ. P. 56(c).

Plaintiffs generally claim that LMES breached its fiduciary duty under ERISA "by failing to properly investigate the matter and/or by lying and/or misleading" them about: 1) their ability to roll-over their 401(k) balances after they were outsourced; and 2) the level of benefits they would receive as SAIC employees. Plaintiffs also allege LMES breached its fiduciary duty by failing to pay promised severance benefits.

A.

ERISA mandates that a "fiduciary . . . discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104, and further provides that

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).[1] LMES, as the administrator of its ERISA-governed plan, was a fiduciary. But ERISA permits LMES to "wear two hats: one as a fiduciary in administering or managing the

_____

[1]ERISA defines a "person" to include a corporation. 29 U.S.C. § 1002(9).

plan for the benefit of participants and the other as employer in performing settlor functions such as establishing, funding, amending, and terminating the trust." *Hunter v. Caliber Sys.*, 220 F.3d 702, 718 (6th Cir. 2000); *see Varity Corp. v. Howe*, 516 U.S. 489, 498 (1996). Because, "when company representatives . . . are not acting in their capacity as a plan fiduciary, . . . they do not bear the legal obligations that go along with fiduciary status," *Ames v. Am. Nat'l Can Co.*, 170 F.3d 751, 757 (7th Cir. 1999), LMES must have been "wearing its fiduciary hat" for Plaintiffs to prevail on their breach of fiduciary duty claim. *See Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) ("[I]n every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether [a person providing services under a plan] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."). We find LEMS was not acting as a fiduciary.

First, as the district court found, LMES's decision to outsource the ITS division was a business decision that did not trigger ERISA's fiduciary standards. *See Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th Cir. 1990) ("ERISA does not require that day-to-day corporate business transactions, which may have a collateral effect on . . . employee benefits, be performed solely in the interest of plan participants." (quotation omitted)); *Ames*, 170 F.3d at 757 (holding that company representatives act as employer, not fiduciary, when negotiating the sale of a division).

Plaintiffs nevertheless insist that LMES's actions taken in the process of implementing this business decision, *i.e.*, failing to investigate and misleading them about their ability to rollover their

401(k) balances and the nature of their future benefits, triggered ERISA's fiduciary standards. *See Sengpiel v. B. F. Goodrich Co.*, 156 F.3d 660, 666 (6th Cir. 1998) ("[C]ertain actions taken in the course of implementing a corporate business decision may be subject to ERISA's fiduciary standards even though the employer's decision itself is not."). Focusing on the specifically targeted actions of LMES, we determine none to be a breach of fiduciary duty.

The Seventh Circuit's reasoning in the comparable *Ames* case facilitates our review. There, American National Can Co. (ANC), the plaintiffs' former employer and plan administrator, made the business decision to sell-off the plaintiffs' division. *Ames*, 170 F.3d at 754. After the sale, the plaintiffs, as former ANC employees and no longer participants in ANC's benefits plan, became participants in their new employer's plan. Before the sale, ANC representatives "publicized the impending benefits changes to [the plaintiffs] in a number of ways," including telling them at an informational meeting that the two benefit plans were "not identical . . . , but . . . very comparable." *Id.* When the plaintiffs later became dissatisfied with the level of benefits, they sued ANC for breaching its fiduciary duty. The Seventh Circuit affirmed the district court's granting of summary judgment to ANC, finding no breach. The panel noted that (1) there was "not a shred of evidence" that the new employer was unable to provide its own benefits and (2) the plaintiffs knew they would not be able to continue receiving benefits under ANC's plan after the sale. *Id.* at 758. The panel therefore agreed with the district court about the absence of a fiduciary duty, opining that "[t]o the extent [the plaintiffs] had specific questions about [benefits under the new plan]," they had to rely

on literature or representatives from their new employer, and characterized ANC's "very-comparable" comment as nothing "more than a general opinion." *Id.*

Similarly, when LMES informed Plaintiffs that they would be allowed to rollover their 401(k) balances, LMES was parroting what SAIC had represented to LMES in its bid: "SAIC's 401(k) plan accepts rollovers from prior employer-sponsored qualified plans." And when LMES suggested that SAIC's benefits package would be "market competitive," it was offering its opinion, gleaned from the consultants it hired to evaluate the bids. If Plaintiffs had questions regarding SAIC's benefits plan, SAIC documents and representative were available to provide them with answers.

Plaintiffs try, but fail, to analogize themselves to the plaintiffs in *Varity*. In that case, Varity, the plaintiffs' employer and benefits-plan administrator, created a *wholly-owned subsidiary*, planning to transfer several of its less-profitable divisions to the newly-formed subsidiary. *Varity*, 516 U.S. at 493. To entice employees to transfer to the subsidiary, Varity affirmatively misled them about the likely effect on their benefits. *Id.* at 493-94. When, as Varity expected, the new company failed, the transferred employees sued, alleging Varity breached its fiduciary duty under ERISA. *Id.* The Supreme Court agreed, holding that "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice *about continued participation*, would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose,"

*id.* at 502 (emphasis added), and thus was "an act of plan administration"—that is, a fiduciary act. *Id.* at 505.

Unlike in *Varity*, the information conveyed by LMES to Plaintiffs did not concern a plan administered by LMES, and nothing suggests that LMES affirmatively or intentionally misled its employees. Plaintiffs did not have a choice "about continued participation" in LMES's plan—as in *Ames*, the business decision to outsource Plaintiffs foreclosed that option. And also as in *Ames*, Plaintiffs were appropriately informed of this fact. LMES's actions, as distinguished from Varity's, did not constitute "discretionary acts of plan management or administration, or . . . acts designed to carry out the very purposes of the plan." *Sengpiel*, 156 F.3d at 666.

Even if LMES's actions did trigger ERISA's fiduciary standards, we would nevertheless affirm because Plaintiffs have not pointed to any evidence to suggest that LMES's alleged breach caused them any harm. Plaintiffs generally assert in their brief that "[they] reasonably relied upon the information provided to them . . . to their detriment" because the "misinformation" "prevented [them] from making an informed decisions [with regard to retirement and future employment]," and because they were "forced to forego [sic] other job opportunities." But Plaintiffs suffer from a paucity of supporting evidence, neglecting to target any specific facts demonstrating such harm. Instead they offer general allegations and cite to entire depositions rather than specific supporting testimony of a deponent. Summary judgment practice requires more. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("Rule 56(e) provides that judgment 'shall be entered' against the

nonmoving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.'  The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *Wardle v. Lexington-Fayette Urban County Gov't*, 45 Fed. Appx. 505, 509 (6th Cir. 2002) ("[A] district court is not required to search the record to determine whether genuine issues of material fact exist when the non-moving party has failed to point them out." (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989))).

B.

Plaintiffs also allege LMES breached its duty by failing to honor its "unequivocal commitment" to provide them severance benefits as required by LMES's 1989 severance plan.  The commitment was not so "unequivocal" however.   In 1989, LMES adopted a "layoff allowance" policy, providing that "[e]mployees *who are laid off on account of lack of work* (reduction in force) will be paid a layoff allowance."  (Emphasis added.)  Almost a decade later, LMES amended, and then entirely replaced, the policy.  Plaintiffs argue that because these amendments were "prepared solely for the purpose of excluding severance benefits to [them]," and because "terminating [Plaintiffs] would have triggered the payment of severance benefits under the plan in existence [before the amendments]," LMES is now obligated to provide them benefits.

The district court found that though "the language of the [original policy] embodie[d] an enforceable obligation to pay eligible employees severance benefits," Plaintiffs were not eligible

because the phrase "lack of work" did not encompass outsourced employees. *See Cassidy v. Akzo Nobel Salt*, 308 F.3d 613, 618 (6th Cir. 2002) (noting that the plain meaning of the phrase "lack of work" does not encompass a situation where plaintiffs are presently doing the same or substantially similar work as they did for their former employer before an asset sale). In their brief, Plaintiffs never challenge this aspect of the district court's holding. Accordingly, we affirm the summary judgment on this claim. And because we agree with the district court that Plaintiffs were not eligible for severance pay under the 1989 plan, we do not pass on the correctness of the district court's other legal conclusions with respect to this issue—namely, that the 1989 policy created an enforceable contractual obligation governed by state law and was not a welfare plan governed by ERISA.

## III. Conclusion

For these reasons we affirm the district court.