In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 21-1872

WALTER DEAN and DEAN WOLLENZIEN, *individually and on be-half of those similarly situated*,

*Plaintiffs-Appellants*,

*v.*

NATIONAL PRODUCTION WORKERS UNION SEVERANCE TRUST PLAN, *et al.*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cv-02694 — **John Robert Blakey**, *Judge*.

_____

ARGUED FEBRUARY 10, 2022 — DECIDED AUGUST 15, 2022

_____

Before MANION and JACKSON-AKIWUMI, *Circuit Judges*.[*]

JACKSON-AKIWUMI, *Circuit Judge*. Walter Dean and Dean Wollenzien sued their former pension plans, the plans'

_____

[*] Circuit Judge Kanne heard argument in this case but died on June 16, 2022. He did not participate in the decision of this case, which is being resolved under 28 U.S.C. § 46(d) by a quorum of the panel.

trustees, and the plans' administrator for various claims under the Employee Retirement Income Security Act of 1974—more commonly known as ERISA. The district court dismissed the suit, and plaintiffs now appeal. We affirm in part, vacate in part, and remand for further proceedings.

I

### A. Factual Background

Plaintiffs are employees of Parsec, Inc. Until 2017, the National Production Workers Union, Local 707, represented them. As members of the NPWU, plaintiffs participated in the NPWU's Severance Trust Plan (the "Severance Plan") and its 401(k) Retirement Plan (the "401(k) Plan," together "the Plans"). These plans are multiemployer defined-contribution plans, where each participant has their own account and is entitled solely to the contributions to that account and any investment gains minus expenses. Parsec contributed to the Severance Plan until 2012 and then to the 401(k) Plan from 2012 until 2017.

In 2016, the Severance Plan settled a lawsuit with the Department of Labor related to mismanagement of its assets and certain loans. The settlement agreement required the Severance Plan to pay back the loans and approved the current administrators of the Severance Plan. The agreement also approved the Severance Plan's use of its third-party accounting firm, Jeffrey W. Krol & Associates.

In 2017, Parsec employees voted to decertify the NPWU and elect Teamsters Local 179 as their new bargaining representative. Before the election, the Teamsters told Parsec employees that their retirement accounts would roll over to the Teamsters' plan. But NPWU trustees and fiduciaries told

them otherwise: If employees switched to the Teamsters, their retirement accounts would become inactive but remain under NPWU control. After the election, Parsec—which was the only employer currently contributing to the NPWU's 401(k) Plan—stopped contributing to it and began contributing to the Teamsters' plan. And as the plan's trustees had warned, the Parsec employees' accounts became inactive but remained under the plan's control.

Plaintiffs, meanwhile, reviewed the Plans' annual disclosures and discovered what they believed to be excessive expenses, including accounting fees paid to Krol & Associates, undisclosed payments to NPWU officers and their relatives, and high salaries for at least one trustee, Vincent Senese, and the plan administrator, James Meltreger.

Plaintiffs requested copies of various documents from the Plans, which they were entitled to under §§ 102, 104, and 105 of ERISA. The Plans responded two months later but did not provide some of the requested documents, including a "summary plan description" for the 401(k) Plan, which simply did not exist.

In June 2018, plaintiffs sent a letter requesting that the Plans roll over their accounts to the Teamsters' plan. The Plans refused and directed plaintiffs to file a claim for distribution of benefits. Two months later, plaintiffs sent a second letter asking for a rollover, which the Plans answered the same way. Finally, in October 2018, plaintiffs submitted a third letter, which they cast as a "formal" rollover claim, where they requested a rollover or, in the alternative, plan documents like the settlement agreement with the Department of Labor. Plaintiffs supplemented that letter in February 2019. Defendants never responded.

Plaintiffs then filed a putative class action against the Plans, the Board of Trustees and the five individuals on it, including Senese, and the plan administrator, Meltreger. Plaintiffs sought the rollover of their accounts to the Teamsters' plan under § 502(a)(1)(B) and § 502(a)(3) of ERISA. They further alleged that defendants had breached their fiduciary duties or otherwise violated ERISA by not amending the Plans to allow rollover, by failing to disclose conflicts of interests with NPWU employees on their payroll, and by paying excessive expenses and salaries. Finally, plaintiffs alleged that Meltreger had failed to timely provide information to which they were entitled.

The district court dismissed the suit for failure to state a claim because the Plans terms did not require rollover and the allegations failed to show that the trustees breached their fiduciary duties. Originally, the district court dismissed the breach of fiduciary duties claims for excessive administrative fees and the claims for the untimely provision of information without prejudice and gave plaintiffs leave to amend. Plaintiffs chose to stand on their allegations and did not file an amended complaint, so the district court converted its dismissal of all counts to dismissal with prejudice. This appeal followed.

## B. The Relevant Provisions of the Plans

Before we go any further, we briefly highlight the core provisions of the Plans at issue. The Plans operate according to two core documents: the trust instrument, which establishes the trust where the Plans hold their assets, and the plan instrument, which provides the terms of the particular plan. *See* 29 U.S.C. §§ 1102–03. Under these instruments, the Plans allowed for distribution of benefits in three scenarios:

severance, death, or when the participant reaches the retirement age of 65. "Severance" occurred when the participant had been laid off or was transferred to non-covered employment for more than a year, but not if the participant entered non-covered employment as a result of the employer no longer being obligated to contribute to the Plans under a collective bargaining agreement.

A qualifying participant needed to file a signed application, in the proper format, to receive benefits. The Plans did not explain what a proper application should include, only that "[t]he Trustees [were] the sole judges of the adequacy of an application and of any applicant's entitlement to benefits." The Plans also allowed direct rollovers of a participant's distributions to other retirement plans, if the participant qualified for their benefits.

When an employer stopped contributing, the instruments required the trustees "to maintain the Accounts of each Participant employed by such former Employer, and to credit or charge each such Account for net investment income, gains, or losses." In this event, employees were not entitled to distributions until their severance or death. If *every* employer stopped contributing to a given plan, that plan would automatically terminate, and the trustees would hold and maintain the employees' accounts "until the [Trust] Fund is fully distributed or the Trust is terminated as provided in the Trust Agreement," which in turn the trustees could terminate "at any time." Finally, the trustees were permitted to amend the Plans.

## II

We review a district court's dismissal for failure to state a claim de novo, presuming the truth of the facts alleged in the complaint and drawing all reasonable inferences in the plaintiffs' favor. *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020) (citations omitted). A district court may consider documents attached to a motion to dismiss if the documents are referenced in the plaintiffs' complaint and are central to the claim. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (citation omitted).

### A.  Demand for Rollover of Assets

Plaintiffs first claim that both plans should have rolled over the assets in their accounts under ERISA's enforcement of rights provisions (§ 502(a)(1)(B)) or as claim of equitable relief (§ 502(a)(3)). A participant or beneficiary may sue a plan "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." ERISA, § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). This provision "is designed to protect contractually defined benefits" and follows traditional forms of contract relief, "including recovery of benefits accrued." *Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 911 (7th Cir. 2013). Like with any contract, we interpret a plan's terms "in an ordinary and popular sense as would a person of average intelligence and experience" and resolve ambiguities "by referring to the federal common law rules of contract interpretation." *Hammond v. Fid. & Guar. Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir. 1992).

Participants, beneficiaries, or fiduciaries may also "enjoin any act or practice which violates any provision of [ERISA] or

the terms of the plan" or "obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan." ERISA, § 502(a)(3), codified at 29 U.S.C. § 1132(a)(3). This is a "catch-all" provision that "offers appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996). As such, a participant generally cannot pursue both a § 502(a)(1)(B) claim and a § 502(a)(3) claim if the two claims seek the same relief or are based on the same allegations. *Griffin v. Teamcare*, 909 F.3d 842, 846 (7th Cir. 2018) (same relief); *Jones v. Am. Gen. Life & Accident Ins. Co.*, 370 F.3d 1065, 1073 (11th Cir. 2004) (same facts). Participants may still plead the two claims in the alternative. *See, e.g.*, *CIGNA Corp. v. Amara*, 563 U.S. 421, 438–42 (2011) (rejecting argument that district court had power to reform the plan's terms under § 502(a)(1)(B) but agreeing that the district court had such power under § 502(a)(3)). We address plaintiffs' claims about each plan in turn.

### 1. *The Severance Plan*

First, plaintiffs cannot pursue a claim under § 502(a)(1)(B) for a rollover of their accounts in the Severance Plan. The plan allows a participant to roll over their distributions into another "eligible retirement plan," with some caveats. The plan allows rollover of only eligible distributions, which means that the participant must be entitled to those distributions before making a rollover request. But plaintiffs did not qualify for their distributions because severance has not occurred, they have not died, and they are not at least 65 years old. Therefore, under the terms of the plan, plaintiffs were not entitled to a rollover.

Plaintiffs argue that the Severance Plan nonetheless requires rollover because it is "intended to qualify under" § 401(a) of the Internal Revenue Code, which in turn requires that a plan be used "for the exclusive benefit of" the participants. 26 U.S.C. § 401(a). But this provision of the tax code does not apply to ERISA. *Reklau v. Merchants Nat'l Corp.*, 808 F.2d 628, 631 (7th Cir. 1986).

Plaintiffs next argue that the district court held them to too high of a pleading burden by requiring them to cite specific provisions of the plan that would allow rollover. Although they are correct that a complaint need not cite a specific provision of a plan to state an ERISA claim, *see Griffin*, 909 F.3d at 845, they still needed to plead facts plausibly showing that they had a right to roll over their accounts. And even on appeal, plaintiffs are unable to explain how the terms of the Severance Plan—which are incorporated into their complaint by reference—entitle them to a rollover. Therefore, their claim for a rollover under § 502(a)(1)(B) fails.

In the alternative, plaintiffs try to pursue rollover as an equitable remedy under § 502(a)(3). Defendants argue that we should ignore plaintiffs' § 502(a)(3) theory because it relies on the same facts and seeks the same relief as their § 502(a)(1)(B) theory. But that is a crabbed view of the ability to plead alternative claims that ignores the Supreme Court's analysis in *CIGNA*. There, the district court changed the terms of the plan—taking out some provisions and adding new ones. 563 U.S. at 425, 433. The Supreme Court concluded that § 502(a)(1)(B)'s plain language did not authorize these changes, which were "akin to the reform of a contract, [and] seem[ed] less like the simple enforcement of a contract as written and more like an equitable remedy." *Id.* at 436. But the

Court held that the district court did have authority to modify the terms of the plan under § 502(a)(3). *Id.* at 442. From this, we conclude that if a plaintiff's claim under § 502(a)(1)(B) is dismissed, that does not prevent them from pursuing a claim under § 502(a)(3). After all, § 502(a)(3) was designed to "offer[] appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity*, 516 U.S. at 512.

The problem for plaintiffs is that equitable relief under § 502(a)(3) must arise from violations of a "provision of [ERISA] or the terms of the plan," or must be necessary "to enforce any provisions of [ERISA] or the terms of the plan." 29 U.S.C. § 1132(a)(3). But as we just explained, plaintiffs do not point to any terms in the Plans that defendants have violated. Nor do they identify any ERISA provision that defendants allegedly violated. Without any contractual or statutory dock to moor their legal theory, plaintiffs fail to state a claim under § 502(a)(3).

### 2. *The 401(k) Plan*

Plaintiffs rely on provisions in the 401(k) Plan that are identical to the ones in the Severance Plan and raise the same argument under § 502(a)(3). Those arguments are unpersuasive for the same reasons. Unique to the 401(k) Plan, plaintiffs argue that when Parsec stopped contributing to the plan, that triggered the plan's automatic-termination provision. Plaintiffs read this provision as part of a wind-up process, where the trust holds on to the participants' accounts only during a short period until all the benefits have been distributed.[1]

---

[1] Plaintiffs also point to IRS Revenue Ruling 89-87 and two bulletins from the Department of Labor to support their reading of the automatic

Plaintiffs' suggested reading is wrong. The automatic-termination provision provides that participants' accounts "shall be held and maintained for the benefit of the then Participants in the same manner and with the same powers, rights, duties and privileges prescribed in the Plan unless and until the Trust Fund is fully distributed or the Trust is terminated as provided in the Trust Agreement." In other words, when the employers stop contributing, the plan will distribute benefits when participants qualify under its terms as usual, unless the underlying trust is separately terminated. And plaintiffs do not allege that Parsec's actions terminated the trust—nor could they, since only the trustees can terminate the trust. This provision does not pertain to rollovers at all. Because the automatic termination section does not provide a basis for a right to roll over assets, plaintiffs fail on their rollover claims for the 401(k) Plan as well.

### B. Failure to Amend Plans to Allow Rollover

Plaintiffs argue that by not amending the Plans to allow rollovers, the trustees and the plan administrator violated their fiduciary duties. Plaintiffs raise two legal theories for this claim: direct relief under § 502(a)(2) for breach of the duty

---

termination section, but none of these sources are helpful. The IRS Revenue Ruling undermines their position because it provides that "[t]ermination of a multiemployer plan under Title IV of ERISA generally does not result in plan assets being distributed as soon as administratively feasible after the date of plan termination under Title IV." Rev. Rul. 89-87, 1989-2 C.B. 81 at *5. And the Department of Labor Bulletins only speak of how fiduciaries should go about locating missing participants—they do not say anything about automatic termination and rollovers. Dep't of Labor Field Assistance Bull. No. 2014-01 at 1; Dep't of Labor Field Assistance Bull. No. 2004-02 at 1.

of loyalty and the duty of prudence or equitable relief under § 502(a)(3) for violating two other provisions of ERISA.

Plaintiffs' first legal theory—breach of the duty of loyalty and duty of prudence—looks to § 404(a)(1) of ERISA, which codifies both duties. Under the duty of loyalty, plan fiduciaries must act "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries," among other requirements. *See* 29 U.S.C. § 1104(a)(1)(A)(i); *Halperin v. Richards*, 7 F.4th 534, 545 (7th Cir. 2021); *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016). The duty of prudence, on the other hand, "requires the fiduciary to act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *Allen*, 835 F.3d at 678 (quoting 29 U.S.C. § 1104(a)(1)(A)–(B)); *see* ERISA § 404(a)(1)(B), codified at 29 U.S.C. § 1104(a)(1)(B).

Participants or beneficiaries may recover "appropriate relief" for a breach of these duties, 29 U.S.C. §§ 1109(a), 1132(a)(2), but only "on behalf of [the] entire plan," or for specific breaches of a duty as to their individual accounts. *Peabody v. Davis*, 636 F.3d 368, 373 (7th Cir. 2011). To establish a § 502(a)(2) claim, a plaintiff must show "(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff."[2] *Allen*, 835 F.3d at 678.

---

[2] Plaintiffs name all defendants in their breach of fiduciary duty counts. Given that plans cannot be fiduciaries of themselves, we affirm the

Plaintiffs' first legal theory fails because amendments to plans are not actionable under ERISA's fiduciary obligations. *S. Ill. Carpenters Welfare Fund v. Carpenters Welfare Fund of Ill.*, 326 F.3d 919, 924 (7th Cir. 2003); *see Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443–44 (1999). Plaintiffs argue that we should create an exception because their claim is about rollovers, which they view as a claim about plan administration and not a claim that affects any participant's benefits. Even so, we have held that trustees do not act as fiduciaries when they amend a plan's terms. *See Milwaukee Area Joint Apprenticeship Training Comm. v. Howell*, 67 F.3d 1333, 1338 (7th Cir. 1995). The fact that the fiduciaries did not do what Plaintiffs wanted them to do does not give rise to a breach of fiduciary duty claim.

In the alternative, plaintiffs advance a second legal theory—equitable relief under § 502(a)(3) for defendants' purported violation of two ERISA provisions. First, plaintiffs invoke § 4235 of ERISA, which requires a plan to transfer assets when an employer withdraws as a result of a change in the bargaining representative. *See* 29 U.S.C. § 1415. But this provision does not apply to defined-contribution plans like the Plans at issue here. 29 U.S.C. §§ 1002(34), 1321(b)(1). To the extent that plaintiffs suggest we follow *Trapani v. Consol. Edison Emps.' Mut. Aid Soc'y, Inc.* 891 F.2d 48 (2d Cir. 1989), we decline to do so. *Trapani* involved health and welfare plans—which pool assets together, *id.* at 50—while the Plans here are defined-contribution plans that separate the assets of each participant's account. *Trapani* recognized that pension plans do not carry the same risk as welfare plans since only "a

---

district court's dismissal of the breach of fiduciary duties claims against the Plans on this basis.

certain percentage of the [welfare plan] members will never receive benefits," so refusing a rollover in those plans would "constitute a windfall to those employees." *Id.* Therefore, the Second Circuit found equitable relief appropriate for the *Trapani* plaintiffs who were beneficiaries of the welfare plan, unlike the plaintiffs in another case who were participants in a pension plan. *See id.* (citing *O'Hare v. General Marine Transport Corp.*, 740 F.2d 160, 173–74 (2d Cir. 1984)). By its own logic, *Trapani* disavows plaintiffs' argument.

Plaintiffs also point to ERISA's anti-inurement provision, § 403(c)(1), which "prohibits [fiduciaries] from misappropriating plan assets for their own benefit." *Beck v. PACE Int'l Union*, 551 U.S. 96, 107 (2007); *see* 29 U.S.C. § 1103(c)(1). But they did not raise this argument before the district court, so they have waived it on appeal. *See Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 306 (7th Cir. 2020).

## C. Undisclosed Payments, Excessive Fees, and High Salaries

Plaintiffs' next two claims are that the trustees and the plan administrator breached their fiduciary duties by paying excessive fees and salaries, and by failing to disclose conflicts of interest regarding NPWU. Plaintiffs allege these actions breached both the duty of loyalty and the duty of prudence. These duties are supplemented by § 406's prohibition on transactions involving parties-in-interest and the fiduciaries themselves. *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 679 (7th Cir. 2014); *see* ERISA, § 406, codified at 29 U.S.C. § 1106. Fiduciaries may not engage in a plan transaction that involves a party in interest, except for "reasonable compensation." 29 U.S.C. §§ 1106(a), 1108(b)(2)(A). The reasonable compensation exception is an affirmative defense, so the defendant bears the

burden. *Allen*, 835 F.3d at 676. Fiduciaries are also prohibited from transacting with a plan's assets for their own interest. 29 U.S.C. § 1106(b).

### 1. *Excessive Expenses and Fees*

The core of plaintiffs' breach of fiduciary duties claims arises from the Severance Plan's allegedly excessive administrative expenses and accounting fees. Plaintiffs rely on an "administrative expense ratio," which looks at what percentage of the total expenses were solely administrative expenses. They also point to a report that analyzes this percentage for health and welfare funds and their own comparisons of other plans' publicly disclosed expenses.

Plaintiffs' ratio presents a fundamental methodological problem. This calculation shows how much of the total expenses of a plan are administrative fees. What it does not do, however, is provide any insight about how high the administrative fees are when compared to other plans.[3] Using plaintiffs' administrative expense ratio would create odd and perverse incentives. For example, if a plan wished to hide its unreasonable administrative fees, it could simply increase the overall cost of its total expenses, driving down the slice that the administrative fees represent. Alternatively, a plan that has been able to lower all of its expenses may be found to have excessive administrative fees despite having lower fees than

---

[3] Plaintiffs suggest that the Department of Labor uses this ratio. But the report plaintiffs cite provides only a table of incomes and expenses and does not actually suggest that the so-called "administrative expense ratio" is at all reliable. Dep't of Labor, Private Pension Plan Bull., at 40 (Jan. 2021), https://www.dol.gov/sites/dolgov/files/EBSA/researchers/statistics/retirement-bulletins/private-pension-plan-bulletins-abstract-2017.pdf.

any other plan simply because their percentage is higher than others.

The expense ratio used in other cases is the ratio of the administrative fees with respect to *the assets*. *See, e.g.*, *Loomis v. Exelon Corp.*, 658 F.3d 667, 669 (7th Cir. 2011) (collecting cases) (emphasis added) ("In recent years participants in pension plans have contended that the sponsor offers … too expensive funds (meaning that the *funds' ratios of expenses to assets are needlessly high*)."). This is a much more principled calculation because the core inquiry for a breach of fiduciary duty claim is whether the fiduciary's conduct harmed the plaintiff, which most commonly emerges as reductions in the assets. *See Allen*, 835 F.3d at 678. Because plaintiffs' "administrative expense ratio" does not provide any insight on its own as to how the administrative fees are excessive, they cannot state breach of fiduciary duty claims regarding the administrative expenses.

Even accepting the ratios at face value, plaintiffs largely rely on incomparable plans that pool assets together, while the Severance Plan here is a defined-contribution plan that holds assets separately for each participant. The report that plaintiffs cite focuses on welfare plans, which hold the assets in a single pile. And their comparisons to other plans' disclosure documents looks mostly at defined-benefit plans, which like welfare plans, "consist[] of a general pool of assets rather than individual dedicated accounts." *Hughes Aircraft*, 525 U.S. at 439. Plaintiffs do not elucidate how comparing a defined-contribution plan like the Severance Plan to welfare and defined-benefit plans demonstrates that defendants mismanaged the plan here.

Plaintiffs point to only two defined-contribution plans: the Teamsters' plan and the Northern Illinois Annuity Fund. But

plaintiffs do not explain why the respective ratios of those plans are an appropriate benchmark. For example, plaintiffs allege that the Teamsters' plan only spent 1% of its total expenses on administrative fees in 2016, but they do not explain how much that plan actually paid in fees. The 1% could indicate lower administrative fees, or it could indicate complete wanton and uncontrolled spending on all other expenses. These percentages without context do not plausibly suggest that the Severance Plan's fees were excessive. The same is true for plaintiffs' invocation of the accounting fees the other two defined-contribution plans paid as compared to the fees that the Severance Plan paid Krol & Associates. All plaintiffs have shown is that two other defined-contribution plans allegedly have lower expenses and fees, but "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund." *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009).[4] Notably, instead of amending their complaint after the motion to dismiss was granted, they stood on their allegations and did not offer any alternative allegations. Therefore, on these allegations, we cannot sustain plaintiffs' claim for breach of fiduciary duties as to the overall expenses or the accounting fees.

---

[4] Plaintiffs suggest that the Supreme Court implicitly overruled *Hecker* when it vacated our decision in *Divane v. Northwestern University*, 953 F.3d 980 (7th Cir. 2020), in its recent decision in *Hughes v. Northwestern University*, 142 S. Ct. 737 (2022). But *Hughes* did not overrule *Hecker* or its reasoning—it only rejected *Divane*'s assumption that a variety of investment options foreclosed any breach of fiduciary duty claims. *See Hughes*, 142 S. Ct. at 742.

### 2. *Parties-in-Interest and High Salaries*

Plaintiffs next argue that the trustees impermissibly engaged in transactions with parties-in-interest when they paid their relatives and NPWU employees. But the individuals at issue were trustees and officers of the Plans. ERISA does not prohibit individuals from occupying different roles; the dual-hat fiduciary is in fact commonplace. *See, e.g.*, *Halperin*, 7 F.4th at 542 ("If dual-hat fiduciaries were not allowed, employers that established ERISA plans would be 'assuming financial liabilities without effective controls,' and '[e]mployers tend not to write blank checks.'"); *Ames v. Am. Nat. Can Co.*, 170 F.3d 751, 757 (7th Cir. 1999) ("[O]ne of the fundamental principles of ERISA plan management … [is that] ERISA fiduciaries are allowed to wear more than one hat"). The fact that NPWU members were drawing salaries from the Plans does not plausibly suggest a breach of fiduciary duties. Absent further allegations that support a more direct conflict of interest, such as allegations that the trustees or officers were not actually performing their duties or received additional side payments outside their salaries, plaintiffs cannot support a breach of fiduciary duties as to the payments to NPWU members.

Plaintiffs' claim for excessive salaries, however, does survive. They allege that the Severance Plan overpaid the plan administrator, Meltreger, and one of the trustees, Senese, by giving each a $20,000 raise. Plaintiffs allege that these salary increases were excessive in light of the "limited function of the Severance Plan as a relatively small defined-contribution plan with little need for day-to-day administrative work." Defendants do not address plaintiffs' allegations regarding Senese's salary. As for Meltreger, defendants argue that the salary was reasonable because he was promoted. But whether

the salary increase was reasonable is an affirmative defense, which cannot defeat a claim at the motion to dismiss stage.[5] *Allen*, 853 F.3d at 676. For now, plaintiffs have alleged enough to plausibly suggest that Meltreger's and Senese's salaries were excessive.

### D. Failure to Provide Information

Plaintiffs' final claim is that Meltreger, the plan administrator, failed to timely respond to their requests for information under § 502(c)(1)(B) of ERISA.[6] They cite four examples: (1) he never provided "information supporting Defendants' refusal to [roll over] plan assets," including a written denial in response to their October 2018 letter; (2) he failed to provide the 2018 annual pension benefits statements; (3) he did not provide "other miscellaneous documents," including the settlement agreement between the plan and the Department of Labor until plaintiffs filed this suit; and (4) he never provided the mandatory disclosure documents for the 401(k)

---

[5] Some courts of appeal have held that the reasonable compensation exception in § 408 does not apply to claims of fiduciary self-dealing under § 406(b). *Acosta v. City Nat'l Corp.*, 922 F.3d 880, 886 (9th Cir. 2019) (citation omitted); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 750 (6th Cir. 2014) (collecting cases); *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 94–96 (3d Cir. 2012). *But see Harley v. Minn. Min. & Mfg. Co.*, 284 F.3d 901, 908–09 (8th Cir. 2002). We need not decide that question here because, even assuming the exception applies, it is an affirmative defense. *Allen*, 853 F.3d at 676.

[6] Plaintiffs name all defendants in this claim, but only the plan administrator is liable under this provision of ERISA. 29 U.S.C. § 1132(c)(1)(B); *see Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1234 (9th Cir. 2000); *see also Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 406 (7th Cir. 1996). We therefore affirm the district court's dismissal of all other defendants on this count.

plan and provided the documents for the Severance Plan twelve days after they were due.

ERISA has copious, detailed rules about responding to requests for information by participants and beneficiaries. If a plan administrator receives a request for information that the plan administrator is required to provide yet fails to provide that information within 30 days, the administrator is personally liable for up to $100 per day from the date of refusal or when the 30-day clock expires. 29 U.S.C. § 1132(c)(1)(B). Administrators must provide pension benefit statements every quarter and year or upon request under § 105. 29 U.S.C. § 1025(a)(1)(A). Participants or beneficiaries may also request "the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated" under § 104 of ERISA. *See* 29 U.S.C. § 1024(b)(4). The phrase "other instruments" in this "catch all" provision only covers "formal legal documents governing a plan." *Ames*, 170 F.3d at 758. When requesting information under § 104, participants must provide "clear notice" of what information they seek. *Anderson v. Flexel, Inc.*, 47 F.3d 243, 248 (7th Cir. 1995). But "an administrator's knowledge of surrounding circumstances or the information being requested may require a response to an otherwise general request." *Id.* The ultimate decision on whether to impose the statutory sanctions and how much is a matter left to the district court's discretion. *Ames*, 170 F.3d at 759–60. A plan administrator may be held liable only for his own personal obligations; any obligations a plan itself has to provide information under ERISA cannot be grounds for a claim against the administrator. *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 406 (7th Cir. 1996).

We easily dispatch with the first category of information plaintiffs claim they did not receive—information related to the denial of their rollover request. Plaintiffs point to § 503's requirement that plans provide participants or beneficiaries with written denials, *see* 29 U.S.C. § 1133(1), and a regulation requiring plans to disclose any information "relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii). But these provisions impose duties on the Plans themselves, not the plan administrator, and therefore they cannot support a claim of individual liability against the plan administrator. *Wilczynski*, 93 F.3d at 406. Moreover, a plaintiff cannot pursue a § 502(c) claim based on a violation of an agency regulation. *Id.* Plaintiffs thus cannot pursue their claim regarding the information related to the denial of rollover.

Plaintiffs sufficiently allege that defendants did not provide the 2018 annual pension benefits statements as required under § 105. 29 U.S.C. § 1025(a)(1)(A). Defendants' two arguments in opposition are unavailing. First, defendants argue that plaintiffs' allegations are underdeveloped because they barely mention § 105. But "it is factual allegations, not legal theories, that must be pleaded in a complaint." *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014) (citation omitted). We do not punish a plaintiff for not invoking specific statutes; what matters is the plaintiff's factual allegations. Next, defendants argue that plaintiffs' allegations undermine their claim because plaintiffs later allege that they received statements since 2015. But defendants misconstrue the complaint and do not properly apply the appropriate standard at the motion to dismiss stage. In the complaint, plaintiffs alleged that the Plans' pension benefits statements contained certain language "since 2015." These allegations do not indicate that plaintiffs actually received their 2018 statements; to

make such an inference against plaintiffs based solely on those allegations would be to read the complaint in a light *least* favorable to plaintiffs. That is the inverse of our standard. *See Taha*, 947 F.3d at 469 (citation omitted). Because nothing in the complaint directly undermines plaintiffs' allegations about the 2018 statements, they may pursue a claim for these documents.

Plaintiffs may also pursue their claim as to the third category of information—but only with respect to the Severance Plan's settlement agreement with the Department of Labor. Plaintiffs sent letters requesting "any other instruments under which the plan is established and operated." This sort of general request—which reads more like a request for production—does not on its face provide notice of what documents plaintiffs were requesting. *See Anderson*, 47 F.3d at 248. But the settlement agreement is a "formal legal document governing" the Severance Plan because it affected the plan's structure and organization. *See Ames*, 170 F.3d at 758. And crucially, the plan administrator was well aware that the settlement agreement affected the plan—he was directly named in it. Therefore, despite the general nature of the request, we can infer that Meltreger should have known the settlement agreement would have been responsive to the request. *See Anderson*, 47 F.3d at 248. Thus, plaintiffs have stated a claim with respect to the settlement agreement.

Finally, plaintiffs state a claim that Meltreger failed to provide the 401(k) Plan's "summary plan description" and that he provided documents related to the Severance Plan only after they were due. Regarding the 401(k) Plan, defendants argue that plaintiffs should have instead asserted their claim under § 102, which requires the 401(k) Plan to create the

summary plan description. 29 U.S.C. § 1022. But that is just
another theory of liability and, again, "a plaintiff need not
plead legal theories." *See BRC Rubber & Plastics, Inc. v. Cont'l
Carbon Co.*, 900 F.3d 529, 540 (7th Cir. 2018) (citation omitted).
Section 104 independently requires the administrator to pro-
vide a plan description to participants or beneficiaries upon
written request. 29 U.S.C. § 1024(b)(4). The plan's failure to
write a plan description does not vitiate plaintiffs' plausibly
alleged claim that the administrator failed to provide the doc-
ument. *See Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200
F.3d 1223, 1234 (9th Cir. 2000) (citation omitted) ("If any of
these documents do not exist at the time of a request, it is con-
sistent with the aims of ERISA to impose a penalty on the plan
administrator because there is nothing keeping the adminis-
trator from preparing a mandatory document where none
previously existed, and it is his burden upon threat of penalty
to do so."). Plaintiffs may pursue a claim against Meltreger
for failing to provide the 401(k) Plan's summary plan descrip-
tion.

As for the Severance Plan's summary plan description and
other requested documents, plaintiffs allege that Meltreger
provided the documents 42 days after they sent their request.
That was 12 days past the 30-day deadline. Defendants argue
that this 12-day delay is harmless. They rely on *Ames*, where
we deferred to a district court's determination that the plain-
tiffs failed to provide clear notice of their request, and we held
in the alternative that any delay was harmless because the
plan provided the documents within one business day. 170
F.3d at 759. While a one-day delay may have been *de minimis*
in that case, it does not follow that a 12-day delay is neces-
sarily harmless. Defendants point to a district court case that
found a 24-day delay was harmless, but they ignore the

analysis in that decision. That case weighed the length of delay as just one of several factors in assessing whether to impose sanctions under § 104. *Jacobs v. Xerox Corp. Long Term Disability Income Plan*, 520 F. Supp. 2d 1022, 1044 (N.D. Ill. 2007) (citing *Romero v. SmithKline Beecham*, 309 F.3d 113, 120 (3d Cir. 2002), and then *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 90 (2d Cir. 2001)). Whether the alleged 12-day delay in this case is harmless is best left to the district court's discretion. *See Ames*, 170 F.3d at 759–60. For now, plaintiffs have alleged enough to plausibly state a claim that the disclosure was untimely.

## III

For the reasons stated above, we AFFIRM in part and VACATE in part the district court's decision and REMAND for further proceedings. We vacate the district court's dismissal of plaintiffs' claim that the Severance Plan paid unreasonable salaries to trustee Vincent Senese and plan administrator James Meltreger, as well as the court's dismissal of plaintiff's claim that Meltreger failed to furnish certain requested information. We affirm the district court's dismissal of the remaining claims.